# UNITED STATES DISTRICT COURT
## EASTERN DISTRICT OF WISCONSIN

**WILLIE E. ADAMS,**

     **Petitioner,**

     **v.**                                  **Case No. 10-CV-11**

**REED RICHARDSON,**

     **Respondent.**

## DECISION AND ORDER DENYING PETITION FOR WRIT OF HABEAS CORPUS

Willie E. Adams, a prisoner in Wisconsin custody, seeks a writ of habeas corpus pursuant to 28 U.S.C. § 2254. Adams was convicted of first-degree reckless homicide while armed with a dangerous weapon and was sentenced to thirty-five years, consisting of twenty-five years of initial confinement followed by ten years of extended supervision. (Am. Habeas Pet. at 2, Docket # 31.) Adams alleges that his conviction and sentence are unconstitutional. For the reasons stated below, the petition for writ of habeas corpus will be denied and the case dismissed.

## BACKGROUND

Adams was charged with first-degree intentional homicide while armed with a dangerous weapon in the shooting death of LaShaun Hayes on April 2, 2004, outside a Milwaukee tavern. (*State v. Adams*, 2007AP2633 (Wis. Ct. App. Nov. 4, 2008), Answer to Am. Habeas Petition ("Answer"), Ex. 5 at 2, Docket # 29-5.) Adams' jury trial began in March 2006 and lasted for eight days. (*Id*). The State's theory was that Adams shot Hayes on sight without justification. (*Id.*) The State relied, in part, on one of Adams' custodial

statements in which he admitted that he fired his weapon without knowing whether Hayes had a gun. (*Id.*) The State also called several witnesses. Paul Hnanicek testified that he was following Hayes out of the tavern when Adams began shooting. (*Id.*) Hnanicek testified that Hayes had a gun, but never took it out of his waistband. (*Id.* at 4.)

Burrell Maull testified that he and Adams had been friends for many years. (*Id.*) Maull testified that he was at the tavern on the night of the shooting and walked out of the tavern behind Hayes and Hnanicek when he heard shooting. (*Id.*) According to Maull, Hayes came back into the bar immediately after shots were fired and dropped a gun, which Maull retrieved and later traded for crack cocaine. (*Id.*) Maull acknowledged that he told no one that Hayes had a weapon until the day before trial, when he disclosed to the prosecution that he "saw something silver" in Hayes' waistband that he believed was a gun. (*Id.*)

Adams, for his part, testified that on the evening of April 2, 2004, he was at the tavern with several companions, including Valerie Burgess and Charnaye Vogelmann. (*Id.* at 3.) As the evening progressed, Adams grew suspicious that someone in the tavern might be planning to rob or assault him. (*Id.*) Adams testified that he and Burgess left the tavern for a time, leaving Vogelmann behind playing pool. (*Id.*) According to Adams, he returned to the tavern to get Vogelmann. (*Id.*) Because Adams still feared a robbery, he brought a gun. (*Id.*) As he approached the tavern, its front door flew open and Hayes emerged. (*Id.*) Adams testified that Hayes swore and pulled out a gun. (*Id.*) To prevent Hayes from firing

his weapon, Adams pulled out his own gun and fired numerous shots towards Hayes. (*Id.*) Adams then fled the scene. (*Id.*)

Vogelmann, whom both Adams and Hnanicek testified was also at the tavern that evening, did not testify. The State, however, called her grandson, Troy Warren. Warren testified that Vogelmann had cancer in April 2004 and was not going out to taverns at the time and was not at the tavern on the night of the shooting. (*Id.*)

The jury convicted Adams of the lesser included offense of first-degree reckless homicide while armed with a dangerous weapon. (*Id.*) Adams filed a post-conviction motion arguing that his trial counsel was ineffective for failing to call Maull as a defense witness to testify that Vogelmann was at the tavern on April 2, 2004, which he argues would have bolstered his credibility and corroborated his claim to have shot Hayes in defense of Vogelmann. (*Id.* at 5.) Adams also asserted that his trial counsel should have called another tavern patron, Lorenzo Conley, as a defense witness. (*Id.*) According to Adams' offer of proof, Conley saw two silhouettes outside of the tavern door that Conley assumed were Hayes and Hnanicek. (*Id.*) These figures were "motioning" in a way that led Conley to believe that they were arguing with somebody. (*Id.*) Moments later, Conley heard gunshots. (*Id.*) Adams contended that Conley's testimony would have corroborated his version of Hayes' actions immediately preceding the shooting. (*Id.*)

The circuit court denied Adams' motion without a hearing, finding Adams was not prejudiced by trial counsel's failure to present the proposed testimony from Maull and Conley. (*Id.*) Adams appealed, raising both the ineffective assistance of counsel issue, and

challenging the circuit court's decision to admit his custodial statements. (*Id.*) The Wisconsin Court of Appeals affirmed the trial court's decision as to both issues. (*Id.* at 6-10.) Adams petitioned the Wisconsin Supreme Court for review, and the court denied his petition. (Answer, Ex. 8, Docket # 29-8.)

Adams filed a petition for writ of habeas corpus in this court on January 8, 2010. (Docket # 1.) Adams moved the Court to stay his petition so he could exhaust several claims in state court. (Docket # 6.) The motion was ultimately granted (Docket # 17), and the case was stayed. Adams filed two Wis. Stat. § 974.06 motions in Milwaukee County Circuit Court, arguing his postconviction counsel was ineffective for failing to: (1) call Barbara Benedetto as a witness; (2) call Andre Taylor as a witness; (3) challenge for cause or move to strike two jurors; and (4) impeach Paul Hnanicek with a prior inconsistent statement. (Resp. Br. at 7–8, Docket # 41.) The circuit court denied the motions, and Adams appealed. The Wisconsin Court of Appeals affirmed. (*State v. Adams*, 2013AP1649 (Wis. Ct. App. July 28, 2015), Answer, Ex. 12, Docket # 29-12.) Adams filed a petition for review in the Wisconsin Supreme Court, and the court denied his petition. (Answer, Ex. 14, Docket # 29-14.)

After exhausting his state court remedies, Adams returned to this Court, asking the Court to lift the stay and allow him to file an amended petition. (Docket # 20, Docket # 21.) The Court granted the motion (Docket # 25) and Adams filed an amended petition for habeas relief. (Docket # 31.) In his amended petition, Adams asserted his ineffective assistance of counsel claims from his Wis. Stat. § 974.06 proceedings, as well as his

ineffective assistance of counsel claims relating to Conley from his direct appeal. (*Id.*) Adams also claimed the circuit court improperly denied his ineffective assistance claim without a hearing, and the court failed to consider the cumulative prejudice from his trial counsel's errors. (*Id.*) Adams also raised the suppression of his custodial statement claim. (*Id.*)

## STANDARD OF REVIEW

Adams' petition is governed by the Antiterrorism and Effective Death Penalty Act ("AEDPA"). Under AEDPA, a writ of habeas corpus may be granted if the state court decision on the merits of the petitioner's claim (1) was "contrary to, or involved an unreasonable application of, clearly established Federal law, as determined by the Supreme Court of the United States," 28 U.S.C. § 2254(d)(1); or (2) "was based on an unreasonable determination of the facts in light of the evidence presented in the State court proceeding," 28 U.S.C. § 2254(d)(2).

A state court's decision is "contrary to . . . clearly established Federal law as established by the United States Supreme Court" if it is "substantially different from relevant [Supreme Court] precedent." *Washington v. Smith*, 219 F.3d 620, 628 (7th Cir. 2000) (quoting *Williams v. Taylor*, 529 U.S. 362, 405 (2000)). The court of appeals for this circuit recognized the narrow application of the "contrary to" clause:

> [U]nder the "contrary to" clause of § 2254(d)(1), [a court] could grant a writ of habeas corpus . . . where the state court applied a rule that contradicts the governing law as expounded in Supreme Court cases or where the state court confronts facts materially indistinguishable from a Supreme Court case and nevertheless arrives at a different result.

5

*Washington*, 219 F.3d at 628. The court further explained that the "unreasonable application of" clause was broader and "allows a federal habeas court to grant habeas relief whenever the state court 'unreasonably applied [a clearly established] principle to the facts of the prisoner's case.'" *Id.* (quoting *Williams*, 529 U.S. at 413).

To be unreasonable, a state court ruling must be more than simply "erroneous" and perhaps more than "clearly erroneous." *Hennon v. Cooper*, 109 F.3d 330, 334 (7th Cir. 1997). Under the "unreasonableness" standard, a state court's decision will stand "if it is one of several equally plausible outcomes." *Hall v. Washington*, 106 F.3d 742, 748–49 (7th Cir. 1997). In *Morgan v. Krenke*, the court explained that:

> Unreasonableness is judged by an objective standard, and under the "unreasonable application" clause, "a federal habeas court may not issue the writ simply because that court concludes in its independent judgment that the relevant state-court decision applied clearly established federal law erroneously or incorrectly. Rather, that application must also be unreasonable."

232 F.3d 562, 565–66 (7th Cir. 2000) (quoting *Williams*, 529 U.S. at 411), *cert. denied*, 532 U.S. 951 (2001). Accordingly, before a court may issue a writ of habeas corpus, it must determine that the state court decision was both incorrect and unreasonable. *Washington*, 219 F.3d at 627.

## ANALYSIS

Adams raises four grounds for relief in his amended habeas petition. In ground one, Adams alleges ineffective assistance of postconviction counsel for failure to present claims of ineffective assistance of trial counsel. Specifically, trial counsel's failure to: (1) produce a prior inconsistent statement made by Hnanicek to impeach his trial testimony; (2) call

Taylor as a witness; (3) call Benedetto as a witness; and (4) challenge for cause or use a preemptory strike to remove two jurors. He also alleges trial counsel was ineffective for failing to call Conley as a defense witness. In ground two, Adams alleges the trial court failed to consider the totality of trial counsel's errors in determining whether he was prejudiced under *Strickland v. Washington*, 466 U.S. 668 (1984). In ground three, Adams argues the trial court erred in failing to grant him a hearing pursuant to *State v. Machner*, 92 Wis. 2d 797, 285 N.W.2d 905 (1979). And in ground four, Adams alleges his custodial statements were taken in violation of his rights under *Miranda v. Arizona*, 384 U.S. 436 (1966).

Despite raising it in his amended petition, Adams has not briefed his ground three claim that the trial court erred in failing to grant him a *Machner* hearing. (Petitioner's Br., Docket # 39 and Petitioner's Reply Br., Docket # 42). Thus, I will assume Adams has abandoned the claim and will not address it. *See Duncan v. State of Wis. Dep't of Health & Family Servs.*, 166 F.3d 930, 934 (7th Cir. 1999). I will address the remaining grounds in turn.

### 1. *Ineffective Assistance of Trial and Postconviction Counsel*

In ground one of his amended habeas petition, Adams alleges that his postconviction counsel was ineffective for failing to raise ineffective assistance of trial counsel. Adams alleges that trial counsel was ineffective in the following respects: (1) failing to produce a prior inconsistent statement made by Hnanicek to impeach his trial testimony; (2) failing to call Taylor as a witness; (3) failing to call Benedetto as a witness; and (4) failing to challenge

for cause or use a preemptory strike to remove two jurors. Adams also alleges trial counsel was ineffective for failing to call Conley as a witness.

As stated above, postconviction counsel raised the issue of whether trial counsel was ineffective for failing to call Conley as a witness during his direct appeal. Thus, I address this issue as a matter of ineffective assistance of trial counsel. As to Adams' claims of ineffective assistance of postconviction counsel, I first address whether I can even consider these claims. Section 2254(i) provides that "[t]he ineffectiveness or incompetence of counsel during Federal or State collateral post-conviction proceedings shall not be a ground for relief in a proceeding arising under section 2254."

Under Wisconsin criminal procedure, issues involving the ineffective assistance of trial counsel are raised in Wis. Stat. § 974.02 motions before the trial court and issues of ineffective assistance of postconviction counsel are raised in Wis. Stat. § 974.06 motions before the trial court. Adams argues that postconviction counsel, who filed the initial motion pursuant to Wis. Stat. § 974.02, was ineffective for failing to raise additional grounds of ineffective assistance of trial counsel. Courts in this district have found that challenging postconviction counsel's failure to preserve the issue of ineffective assistance of trial counsel for direct appeal does not regard counsel's performance during a collateral proceeding, and thus is not precluded by 28 U.S.C. § 2254(i). *Nelson v. Huibregtse*, No. 07-C-1022, 2009 WL 73149, at *4 n.1 (E.D. Wis. Jan. 6, 2009); *McCloud v. Jenkins*, No. 07-C-1050, 2007 WL 4561108, at *4 n.1 (E.D. Wis. Dec. 21, 2007).

In *Huusko v. Jenkins*, 556 F.3d 633, 635 (7th Cir. 2009), the Seventh Circuit questioned whether Wisconsin's procedure in § 974.02 should be deemed "collateral," noting that in federal court and most state courts, a hearing to inquire into the effectiveness of trial counsel is normally a collateral proceeding. *Id.* at 635–36. The court noted that if Wisconsin's § 974.02 proceeding was deemed non-collateral and therefore outside the scope of § 2254(i), then "Wisconsin's prisoners will enjoy a right to effective assistance of counsel in pursuing ineffective-assistance contentions, even though prisoners in Indiana, Illinois, and most other states do not enjoy such a right." *Id.* at 636. Having posed the question, the court decided not to answer it, noting that the state had waived it and petitioner's claim failed on the merits. *Id.* at 635.

The respondent affirmatively asserts that a § 974.02 proceeding is part of Wisconsin's direct appeal process (and thus is non-collateral); as such, Adams was entitled to constitutionally effective assistance from postconviction counsel. (Resp. Br. at 14, Docket # 41.) Given the fact the *Huusko* court left unanswered whether § 2254(i) applies to a § 974.02 proceeding and the respondent has not raised the issue, I will assume, without deciding, that Adams' claims are not barred by § 2254(i).

The Sixth Amendment, made applicable to the states by way of the Due Process Clause of the Fourteenth Amendment, *see Gideon v. Wainwright*, 372 U.S. 335 (1963), entitles a criminal defendant to the effective assistance of counsel not only at trial, but during his first appeal as of right. *Evitts v. Lucey*, 469 U.S. 387 (1985). The appropriate standard for evaluating a claim of ineffective assistance of appellate counsel is the standard

established in *Strickland v. Washington*, 466 U.S. 668 (1984). *See Winters v. Miller*, 274 F.3d 1161, 1167 (7th Cir. 2001).[1] The general *Strickland* standard governs claims of ineffective assistance of appellate counsel as well as trial counsel, "but with a special gloss when the challenge is aimed at the selection of issues to present on appeal." *Makiel v. Butler*, 782 F.3d 882, 897 (7th Cir. 2015). Because appellate counsel is not required to raise every non-frivolous issue on appeal, appellate counsel's performance is deficient under *Strickland* only if she fails to argue an issue that is both "obvious" and "clearly stronger" than the issues actually raised. *Id.* at 898. Proving that an unraised claim is clearly stronger than a claim that was raised is generally difficult "because the comparative strength of two claims is usually debatable." *Id.* (internal quotation and citation omitted).

To prevail on a Sixth Amendment ineffectiveness claim, a petitioner must satisfy both prongs of a two-pronged test. Adams must show both "that counsel's performance was deficient" and "that the deficient performance prejudiced the defense." *Strickland*, 466 U.S. at 687. To satisfy *Strickland*'s performance prong, the defendant must identify "acts or omissions of counsel that could not be the result of professional judgment." *United States ex rel. Thomas v. O'Leary*, 856 F.2d 1011, 1015 (7th Cir. 1988) (citing *Strickland*, 466 U.S. at 690). "The question is whether an attorney's representation amounted to incompetence under 'prevailing professional norms,' not whether it deviated from best practices or most common custom." *Harrington v. Richter*, 131 S. Ct. 770, 788 (2011) (quoting *Strickland*, 466

---

[1]Although Adams does not challenge postconviction counsel's performance in the court of appeals, but in the § 974.02 proceeding in the trial court (which is how claims of how ineffective assistance of trial counsel must be made in Wisconsin), given the nature of the proceedings, I consider counsel's performance using the appellate attorney standard of *Strickland*. *See Hipler v. Hepp*, No. 09-CV-371-SLC, 2010 WL 1687873, at *6 n.2 (W.D. Wis. Apr. 23, 2010).

U.S. at 689). A reviewing court must seek to "evaluate the conduct from counsel's perspective at the time." *Strickland*, 466 U.S. at 689. We "must indulge a strong presumption that counsel's conduct falls within a wide range of reasonable professional assistance," *id.*, and "strategic choices made after thorough investigation of law and facts relevant to plausible options are virtually unchallengeable," *id.* at 690.

To establish prejudice, it is "not enough for the defendant to show that his counsel's errors had some conceivable effect on the outcome of the [trial]." *Hough v. Anderson*, 272 F.3d 878, 891 (7th Cir. 2001). A petitioner must show "that there is a reasonable probability that, but for counsel's errors, the result of the [trial] would have been different." *Strickland*, 466 U.S. at 694. This does not mean that the defendant must show that "counsel's deficient conduct more likely than not altered the outcome in the case." *Id.* at 693. Rather, a "reasonable probability is a probability sufficient to undermine confidence in the outcome." *Id.* at 694. Making this probability determination requires consideration of the totality of the evidence before the jury. *Id.* at 695. A "verdict or conclusion only weakly supported by the record is more likely to have been affected by errors than one with overwhelming record support." *Id.* at 696.

A court deciding an ineffective assistance claim need not approach the inquiry "in the same order or even to address both components of the inquiry if the defendant makes an insufficient showing on one." *Id.* at 697. "[A] court need not determine whether counsel's performance was deficient before examining the prejudice suffered by the defendant as a result of the alleged deficiencies. The object of an ineffectiveness claim is not to grade

counsel's performance. If it is easier to dispose of an ineffectiveness claim on the ground of lack of sufficient prejudice, which we expect will often be so, that course should be followed. Courts should strive to ensure that ineffectiveness claims not become so burdensome to defense counsel that the entire criminal justice system suffers as a result." *Id.*

Adams does not address the deficiency of postconviction counsel from the aspect of the issues postconviction counsel chose to raise on appeal. Rather, Adams effectively addresses trial counsel's alleged errors pursuant to *Strickland*. Although respondent argues I should decline to address Adams' ineffective assistance of postconviction counsel claims because Adams does not attempt to satisfy the "clearly stronger" standard, given Adams' *pro se* status and given the fact both parties briefed the issues on the merits, I will address Adams' claims.

### 1.1 Failure to Impeach Hnanicek with Prior Inconsistent Statements

Adams argues trial counsel's performance was deficient for failing to impeach Hnanicek with a prior inconsistent statement. At trial, Hnanicek testified that he was a few inches behind Hayes when Hayes was shot in April 2004. (Mar. 24, 2006 Jury Trial Transcript at 8, Answer, Ex. 31a, Docket # 29-33.) Hnanicek testified that the shooter was twenty-some feet in front of them and identified the shooter as Adams. (*Id.* at 11–12.) Hnanicek stated that when Hayes opened the tavern door to leave, he did not hear anyone yell or say anything; (*id.* at 16–17); however, he testified that Hayes, Adams, and two other individuals had an "animated conversation" earlier that night (*id.* at 38). Hnanicek testified that when the door opened, he saw Adams point his gun and start shooting. (*Id.* at 17.)

Hnanicek denied having any sort of dispute or argument with Adams that night. (*Id.*) Hnanicek testified that before the shooting, Hayes had a gun in his front waistband; however, all he saw was an outline of the gun under Hayes' shirt so he could not identify the color of the gun. (*Id.* at 19–20.) When asked whether Hayes had a gun in his hand when they walked out of the door, Hnanicek testified "[n]ot that I seen, but his back was to me." (*Id.* at 20.) Hnanicek further testified that when they stepped outside and saw Adams, Hnanicek could not see a gun in Hayes' hand. (*Id.*)

Adams states that Hnanicek gave him a handwritten letter while the two were in jail together, and Adams gave the letter to his attorney before trial. (Docket # 31-2 at 15.) In the letter, Hnanicek states that he saw Hayes prior to the shooting with a chrome semi-automatic pistol. (Answer, Ex. 13, Docket # 29-13 at 93.) Hnanicek states in the letter that he observed Hayes walk out of the tavern and heard shouting, so he followed behind to see what was happening. (*Id.*) As Hnanicek walked to the door, he observed Hayes raising the gun and then heard several shots. (*Id.*) Hnanicek stated that after the shooting he went back into the tavern and saw Hayes, who had been shot, enter the tavern. (*Id.*) Hnanicek observed a man pick up Hayes' gun. (*Id.*) In his statement to a defense investigator, Hnanicek stated that he was following Hayes out of the bar and as he was exiting, he heard four to five gunshots coming from the direction of the main entrance. (Docket # 39-1 at 80.)

Adams argues that the issue of whether Hayes had his gun out, poised to shoot, goes directly to Adams' theory that he fired in self-defense. (Docket # 39 at 23.) Adams argues that had counsel impeached Hnanicek's trial testimony that he did not see a gun in Hayes'

hand as they walked out the tavern door with his handwritten letter in which he stated he observed Hayes raising his gun, Adams could have proved his self-defense theory. (*Id.*)

The court of appeals rejected Adams' argument, finding that the letter did not support Adams' self-defense claim and Adams could not show he was prejudiced by his attorney's failure to impeach Hnanicek with either document. (Docket # 31-2 at 15.) Adopting the trial court's analysis, the court of appeals found that although Hnanicek's letter clearly states that Hnanicek "observed [Hayes] r[a]ising the gun," it does not state that Hayes raised the gun before Adams raised or fired his own gun. (Docket # 31-2 at 15.) Further, the state court found that Hnanicek's letter did not help Adams because Hnanicek's testimony was "simply too impeachable for a jury to give it much weight" given the fact that Hnanicek gave four inconsistent stories of the events over a span of three years and because any weight a jury might have given any of Hnanicek's stories pales in comparison to the weight the jury likely placed on Adams' confession. (*Id.* at 16–17.)

Adams has not shown the court of appeals' finding contravened *Strickland*. While Adams argues the information contained in Hnanicek's letter was "of critical importance" and was the "strongest evidence of self-defense that the defense had," (Petitioner's Reply Br. at 10, Docket # 42), the court of appeals is correct that Hnanicek's letter does not reveal who "drew first." (Docket # 31-2 at 16.) I agree that Hnanicek's letter, in which he definitely stated that he saw Hayes raising his gun, in contrast to his trial testimony in which he stated that he did not see Hayes with a gun in his hand, lends support to Adams' self-defense theory. However, given Adams' confession to law enforcement, in which he stated

14

that he saw Hayes coming through the front door of the bar with his hand tucked inside of his coat, that he did not know what Hayes had in his hand if anything at all, and stated that he did not see a gun but he knows "that bullets kill and, you know, you got to be the first one to the draw," (Mar. 23, 2006 Jury Trial Transcript at 62–63, Answer, Ex. 28, Docket # 29-30), Adams cannot show he was prejudiced by counsel's failure to impeach Hnanicek's testimony regarding whether Hayes had drawn his weapon. Thus, Adams is not entitled to habeas relief on this ground.

### 1.2    Failure to Call Taylor as a Defense Witness

Taylor told a defense investigator that on the night in question, Hayes "kept displaying a nickel-plated, semi-automatic handgun that was tucked inside his left, inner jacket pocket" and was "making comments about something happening, or what he would do." (Answer, Ex. 13 at 97, Docket # 29-13.) Taylor stated that he believed Hayes was out to rob somebody that night, namely him and Adams. (*Id.*) Adams argues that Taylor could have testified that Hayes was wielding a weapon and making threats and that Adams would have reasonably felt in danger, thus, bolstering his self-defense claim. (Docket # 39 at 28.)

The court of appeals found that Adams was not prejudiced by counsel's failure to call Taylor as a witness. (Docket # 31-2 at 8.) The court reasoned that Taylor had nothing to say on the issue of Adams' self-defense theory because he was not there when guns were drawn. (*Id.* at 10.) Further, while Adams argues Taylor's testimony would have lifted Adams' credibility because it corroborated Adams' testimony generally (such as his testimony that he returned to the tavern that night because he feared for Vogelmann's safety), the court of

15

appeals found that Taylor's "corroborative testimony would not have lifted Mr. Adams' testimony far enough. Juries are choosy; they do not buy wholesale. It's quite possible the jury actually credited Mr. Adams' story about returning to the bar out of concern for Ms. Vogelmann . . . [but] it is clear that they rejected the other part, about Mr. Hayes drawing first." (*Id.* at 11.) Finally, the court of appeals found that Adams so "badly abused his own credibility that the corroborative lift from Mr. Taylor's testimony would not have been enough to save Mr. Adams from drowning in his own testimony"; specifically, his trial testimony that Hayes drew first was contradicted by his prior statement to police that he never saw a gun and felt the need to be the first one to draw. (*Id.*)

Again, Adams cannot show the court of appeals' decision was an unreasonable application of *Strickland*. To establish prejudice under *Strickland*, Adams must show that but for counsel's errors, the result of the trial could have been different. Given the fact Taylor did not witness the shooting and given Adams' confession, failing to call Taylor as a defense witness does not undermine confidence in the outcome of this trial. Thus, Adams is not entitled to habeas relief on this ground.

### 1.3    Failure to Call Benedetto as a Defense Witness

Benedetto lived near the tavern with her roommate, Sharon Huntsinger. (Answer, Ex. 13 at 100, Docket # 29-13.) Benedetto gave a statement to law enforcement in which she said that on the night in question, she was standing on her back balcony smoking a cigarette. (*Id.*) She heard a loud argument coming from the tavern and observed four unknown individuals standing outside the front entrance to the tavern. (*Id.*) She heard a lot

of swearing. (*Id.*) While she could hear that the voices were male, she could not identify the race or clothing of the individuals. (*Id.*) Benedetto then went inside her residence, but could still hear the people arguing. (*Id.*) Several minutes later, Benedetto heard gunshots. (*Id.*) Benedetto stated that Huntsinger also heard the gunshots. (*Id.* at 101.) Adams argues that Benedetto's testimony (that she heard arguing and swearing before the gunshots) would have cut against the State's theory that Adams ambushed Hayes. (Docket # 39 at 34.)

The court of appeals found that Adams was not prejudiced by counsel's failure to call Benedetto as a defense witness because Benedetto "saw and heard too little to corroborate Mr. Adams' defense . . . . Although she saw and heard people arguing, she could not say whether Mr. Hayes was among the people she saw and heard arguing. She could not say he was even outside the bar before he was shot. The inferences Mr. Adams would ask the jury to draw from her observations are too inconclusive and speculative to have probative value." (Docket # 31-2 at 7–8.)

The court of appeals is correct. What is more, while defense counsel did not call Benedetto as a witness, defense counsel did call Huntsinger as a witness. Huntsinger testified that on the night of April 2, 2004, she heard (through her open bedroom window) arguing outside and then heard gunshots. (Mar. 24, 2006 Jury Trial Transcript at 97–98, Answer, Ex. 33, Docket # 29-33.) Thus, the testimony Adams was hoping to get before the jury through Benedetto, he got through Huntsinger. For these reasons, Adams cannot show the court of appeals unreasonably applied *Strickland*.

1.4     Failure to Call Conley as a Defense Witness

Conley gave a statement to law enforcement in which he stated that on the night in question, he was at the tavern with Hayes. (Answer, Ex. 2 at 71, Docket # 29-2.) He observed two silhouette figures standing outside the front door of the tavern and assumed it was Hayes and "Wedo." (*Id.*) Conley saw the figures motioning in a manner that made him believe they were arguing with somebody. (*Id.*) Conley turned away and heard around seven to eight gunshots in rapid succession. (*Id.*) After hearing the gunshots, he turned back toward the front door and saw "Wedo" come in the bar through the front door. (*Id.* at 72.) "Wedo" stated that someone outside was shooting and he wondered what he was shooting at. (*Id.*) Conley then saw Hayes come through the front door stating that he was hit. (*Id.*) Conley stated that Hayes was happy prior to the incident and did not get into any arguments with anyone at the bar. (*Id.*) Adams argues that Conley's testimony would have supported Adams' claim that Hayes came out of the door, followed by Hnaniček, swore at him, and then pulled his gun. (Docket # 39 at 37.) Adams argues that Conley's statement that Hayes and Hnanicek were arguing with someone before the shots were fired was consistent with his defense theory. (*Id.*)

The court of appeals found that because Conley's proposed testimony was nothing more than his suppositions that the two silhouetted figures were Hnanciek and Hayes and that their motions indicated an argument with a third, unseen individual, the proffered testimony was too inconclusive and speculative to have probative value. (Docket # 29-5 at 10.) Thus, counsel's failure to offer Conley's testimony did not prejudice Adams. (*Id.*)

Again, the court of appeals is correct. While Adams argues that because Conley was Hayes' friend and was with him before and after he was shot, his belief that Hayes was arguing with someone outside would have been accorded more weight by the jury and would have supported his theory of defense (Docket # 39 at 37), Conley does not state that he actually saw Hayes and Hnanciek outside the tavern arguing with someone. Conley states that he saw two silhouetted figures that he assumed were Hayes and "Wedo" and saw these two figures make motions that he believed could be an argument. (Docket # 29-2 at 71.) The court of appeals' finding that this testimony would have been too speculative to be probative does not run afoul of *Strickland*. Thus, Adams is not entitled to habeas relief on this ground.

### 1.5    Failure to Remove Jurors for Bias

Adams argues his trial counsel was ineffective for failing to remove two jurors who showed bias. The jurors in question were Juror Miller and Juror Immer. During *voir dire*, defense counsel asked whether there was anyone on the panel who felt that under no circumstances should someone have a right to defend themselves "to the extent of someone being killed." (Mar. 21, 2006 Jury Trial Transcript at 38, Answer, Ex. 24a, Docket # 29-25.) Juror Miller responded that "it depends on the situation, what would be [sic] person be doing with a gun outside of the home." (*Id.*) Defense counsel followed-up asking "You can correct me if I'm wrong, but your - - your feeling is that - - that people probably shouldn't have had a gun outside the home; is that - -," to which Juror Miller responded "[t]hat's correct, and from my understanding, that's the law, too." (*Id.* at 38–39.)

Defense counsel then clarified that the issue is not whether it was lawful for someone to have a gun outside the home, but whether the person was properly defending themselves, as instructed by the court. (*Id.* at 39.) Counsel then asked "Do you think you can separate your feelings with regard to gun carrying and listen to the evidence and listen to what self-defense - - how self-defense is defined legally and make a decisions based on the facts?" (*Id.*) Juror Miller stated that "I guess the problem I'm having is, I don't have a problem with someone defending themselves, but if they're not in a legal position to defend themselves with a weapon outside of their home, my question, I guess, would have to be, well, what are they doing with a weapon outside the home, and what did they intend to do with that weapon in the first place?" (*Id.* at 40.)

The judge then intervened, stating that if self-defense was an issue in the case, the jury would be instructed on the law of self-defense and would be permitted to evaluate the totality of the circumstances in evidence that supports or discredits the self-defense claim, including whether the person was armed prior to the incident. (*Id.* at 41.) Defense counsel then asked Juror Miller whether he would give that factor (i.e., the fact a person was armed) more weight than other information he was provided, to which he responded "possibly." (*Id.*)

Defense counsel then asked if anyone else felt like Juror Miller, to which Juror Immer stated that "I agree. If he had the gun to begin with, what is his - - you know, why did he have it, and if he didn't have it, it may not have occurred. So that - - That would

cloud my judgment, I think." (*Id.* at 42–43.) Defense counsel did not follow-up with Juror Immer.

The court of appeals found that counsel was not ineffective for failing to object to these two jurors. (Docket # 31-2 at 12–13.) The court of appeals found that a prospective juror's unwillingness to apply the law as instructed would be grounds for removal. The court stated that Adams "would have a right to be concerned if the comments made by these prospective jurors demonstrated some 'preconceived convictions of the accused['s] credibility and rights that were unwavering' or that Juror Miller in particular 'was probably going to use the gun outside the home fact as a great weight unfavorably towards [Mr. Adams] regardless of any facts, evidence or circumstances yet to be produced, or any legal definition handed down by the courts.'" (*Id.* at 13.) The court found, though, that Adams' "concerns are unfounded" because "[a]t a later point in the jury selection process," all of the prospective jurors were asked whether they would set aside their personal opinions about the law and follow the court's instructions," and all but one agreed to do so. (*Id.* at 14.) The juror who disagreed was removed from the panel. (*Id.*)

Both the Fifth Amendment right to due process and the Sixth Amendment right to an impartial jury protect a defendant against juror bias. U.S. Const. amend. V and VI. *See also Skilling v. United States*, 561 U.S. 358, 438 (2010) (Sotomayor, J. concurring in part and dissenting in part) ("The Sixth Amendment right to an impartial jury and the due process right to a fundamentally fair trial guarantee to criminal defendants a trial in which jurors set aside preconceptions, disregard extrajudicial influences, and decide guilt or innocence

'based on the evidence presented in court.'"); *United States v. Torres-Chavez*, 744 F.3d 988, 997 (7th Cir. 2014) ("Both the Fifth Amendment right to due process and the Sixth Amendment right to an impartial jury protect a defendant against juror bias."). These rights guarantee a jury "capable and willing to decide the case solely on the evidence before it," *Smith v. Phillips*, 455 U.S. 209, 217 (1982), and consistent with the trial court's instructions, *Morgan v. Illinois*, 504 U.S. 719, 728 (1992), as distinct from preconceived notions or extraneous influences. In this context, there is a "critical difference" between a juror's personal beliefs and a bias that requires disqualification:

> Everyone brings to a case a set of beliefs that may incline him in one direction or another. A person told that X had been indicted, and asked whether he thought X guilty, might reply that he thought X probably was guilty because few innocent people are indicted. That would be a prior [belief]. It would be a bias only if it were irrational or unshakable, so that the prospective juror "would be *unable* to faithfully and impartially apply the law," *Wainwright v. Witt*, 469 U.S. 412, 424, 105 S. Ct. 844, 83 L.Ed.2d 841 (1985) (emphasis added), would be, in other words, "adamant," *Fleenor v. Anderson*, 171 F.3d 1096, 1099 (7th Cir. 1999)—in our hypothetical if, for example, the person added, "Nothing will ever convince me that the government would indict an innocent person."

*Griffin v. Bell*, 694 F.3d 817, 824 (7th Cir. 2012) (quoting *Thompson v. Altheimer & Gray*, 248 F.3d 621, 625 (7th Cir. 2001)).

As to Juror Miller, the record contains no unequivocal or adamant expression of bias. Juror Miller never said that he had prejudged Adams' guilt, could not be fair, or would be unable to set aside his personal feelings and decide the case based on the evidence. When Juror Miller expressed concern about someone carrying a gun outside the home, defense counsel probed further into his beliefs. Juror Miller stated that he had no problem with

someone defending themselves, he just questioned why someone was carrying a gun in the first place. When asked whether he would weigh this factor (i.e., carrying a weapon) heavier than other factors in determining self-defense, he said "possibly." A juror resisting giving a definitive answer to questions on how he or she would decide the case does not indicate bias. *See id.* For these reasons, the court of appeals' finding that counsel was not ineffective for failing to strike Juror Miller does not run afoul of *Strickland*.

Adams also fails to show that court of appeals' finding as to Juror Immer violates *Strickland*. Juror Immer responded to defense counsel's question of whether anyone else felt the same as Juror Miller. Juror Immer stated that "I agree. If he had the gun to begin with, what is his - - you know, why did he have it, and if he didn't have it, it may not have occurred. So that - - That would cloud my judgment, I think." (Docket # 29-25 at 42–43.) There were no follow-up questions given to Juror Immer. Adams, relying on a Title VII employment discrimination decision, *Thompson v. Altheimer & Gray*, 248 F.3d 621 (7th Cir. 2001), argues that defense counsel erred in failing to strike Juror Immer. Adams argues that because Juror Immer stated that the fact Adams had a gun outside the home would "cloud [his] judgment" and the juror in *Thompson* similarly stated that her background would "cloud her judgment," he is entitled to habeas relief. (Docket # 39 at 42.)

*Thompson* is, however, not dispositive of Adams' case. To be entitled to habeas relief, Adams must show that the court of appeals' decision violated federal law as determined by the United States Supreme Court. 28 U.S.C. § 2254(d)(1). Although the constitutional right to an impartial jury was at stake in *Thompson*, the legal question before the Seventh Circuit

was whether the trial judge had erred in not asking the juror follow-up questions about her prior beliefs, not the conduct of the trial counsel, which is at issue here. This is important in the context of habeas review where trial counsel is owed "double deference." *See Thompkins v. Pfister*, 698 F.3d 976, 986 (7th Cir. 2012) (internal citations omitted) ("Judicial scrutiny of counsel's performance is 'highly deferential' and under AEDPA we defer to the state court's application of *Strickland* on federal habeas review, meaning that our evaluation of counsel's performance is 'doubly deferential.'"). Adams cites to no Supreme Court case that the court of appeals contravened.

In finding no ineffective assistance of counsel, the court of appeals relied on the fact that Juror Immer, like all of the jurors, agreed that they would follow the law as instructed, even if they disagreed with it. (Docket # 14-15.) Adams is correct that the trial court and court of appeals incorrectly stated that it was during a later part of the *voir dire* process that the jurors all agreed they would follow the law as instructed—it happened before Juror Immer made his statement. However, whether Juror Immer made his statement before or after, Adams has not shown that it was unreasonable for the court of appeals to rely on such assurance. For these reasons, Adams has not shown that the court of appeals' finding that Juror Immer was not unwilling to follow the court's instructions as to the law of self-defense was an unreasonable application of *Strickland*. As such, Adams is not entitled to habeas relief on this ground.

2. *Cumulative Effect of Errors*

Adams argues that the combined effect of counsel's alleged errors was prejudicial. "[E]ven if individual acts or omissions are not so grievous as to merit a finding of incompetence or of prejudice from incompetence, their cumulative effect may be substantial enough to meet the *Strickland* test." *Crisp v. Duckworth*, 743 F.2d 580, 583 (7th Cir. 1984). Except for the juror bias issue, the court of appeals addressed Adams' other claims based on prejudice rather than ineffective assistance. This is a perfectly acceptable way to proceed. *See Strickland*, 466 U.S. at 697 ("If it is easier to dispose of an ineffectiveness claim on the ground of lack of sufficient prejudice, which we expect will often be so, that course should be followed."). However, because the court of appeals did not specifically address whether counsel did in fact err, it did not consider the cumulative effect of the alleged errors. Even looking at the issue *de novo*, however, I do not find Adams was prejudiced by counsel's alleged errors in combination.

3. *Admission of Custodial Statements*

Adams argues the trial court erred in admitting his custodial statements into evidence. Detective Michael Caballero of the Milwaukee Police Department testified that on April 30, 2004, he traveled to Chicago to interview Adams regarding Hayes' death. (Mar. 23, 2006 Jury Trial Transcript at 3, Answer, Ex. 28, Docket # 29-30.) The court admitted into evidence a statement Caballero wrote taken from Adams' interview in Chicago. (*Id.*) Caballero testified that Adams was advised of his *Miranda* rights but Adams refused to sign the form acknowledging that he was advised of his rights. (*Id.* at 6–7.) Adams

25

was interviewed for approximately seven hours. (*Id.* at 7.) At no time did Adams indicate that he wanted to remain silent and at no time did he request a lawyer. (Oct. 22, 2004 Suppression Hearing, Ex. 18 at 29–30, Docket # 29-18.) Caballero testified that Adams never told him that he had already talked to a lawyer on the phone. (*Id.* at 30.)

Detective Eric Gulbrandson of the Milwaukee Police Department interviewed Adams in Milwaukee on May 12, 2004. (*Id.* at 50–51.) Gulbrandson testified that he began his interview with Adams by introducing himself and his partner, Detective Heier, telling Adams why he was in custody, and reading Adams his *Miranda* rights. (*Id.* at 51.) Gulbrandson testified that he asked Adams whether he wanted to make a statement regarding his arrest, to which he responded that he did. (*Id.* at 53.) Gulbrandson spent approximately nine hours with Adams. (*Id.* at 54.) Gulbrandson wrote out the statement and Adams signed and initialed each page after he reviewed it to indicate that the facts were truthful. (*Id.* at 55–56.) Gulbrandson testified that Adams voluntarily signed and initialed the statement. (*Id.* at 58–59.) Gulbrandson testified that at no point did Adams indicate that he did not want to talk, never indicated in any way that he wanted or had interest in speaking to an attorney before he talked, and at no point ever asked for an attorney. (*Id.* at 61.)

Adams testified that he was arrested in Chicago and was taken to a station there. (Dec. 10, 2004 Suppression Hearing, Ex. 20 at 8, Docket # 29-20.) Adams testified that while in jail in Chicago, he asked to use the telephone to call an attorney named Earl Washington. (*Id.* at 10.) Adams testified that he had a conversation with Washington over

the telephone and Washington visited him in jail. (*Id.* at 10–11.) Adams testified that he was read his *Miranda* rights and at that time, he asked for a lawyer and spoke to Washington. (*Id.* at 13.) Adams testified that he was subsequently brought back to Wisconsin and was questioned about the homicide by two detectives. (*Id.* at 15.) Prior to the questioning, Adams testified the detectives read him his *Miranda* rights and he told them that he wanted an attorney and that he did not want to talk about it. (*Id.* at 16–17.) Adams stated that despite his request for an attorney, the detectives continued to speak to him. (*Id.*) Adams testified that at the time he made the incriminating statements, he still wanted a lawyer. (*Id.* at 19.) He also testified that he signed the statement where the detectives told him to sign. (*Id.* at 30–31.)

The trial court ruled that the testimony of Caballero and Gulbrandson was credible. (Dec. 22, 2004 Suppression Hearing, Ex. 21 at 25, Docket # 29-21.) The judge found that Adams was advised of his rights before Adams spoke to the detectives, Adams did not ask for an attorney or assert his right to remain silent, and Adams freely, voluntarily, and intelligently waived his rights after he was given them. (*Id.*) Thus, the court denied the suppression of Adams' statements. (*Id.* at 26.) At trial, Gulbrandson testified that Adams stated that he saw Hayes coming through the front door of the bar with his hand tucked inside of his coat, that he did not know what Hayes had in his hand if anything at all, and stated that he never saw a gun but he knows "that bullets kill and, you know, you got to be the first one to the draw." (Docket # 29-30 at 62–63.)

The court of appeals noted that while Adams acknowledged the detectives' testimony, he pointed to his own, contradictory testimony as support that the trial court erred in admitting his statements. (Docket # 29-5 at 6.) The court of appeals held that the trial court found the detectives credible and it was bound by that finding if not clearly erroneous. (*Id.* at 7.) Adams again argues that his testimony showed he unequivocally requested counsel prior to questioning and the detectives failed to cease their questioning. (Docket # 39 at 54–55.)

Adams challenges the state court's factual finding that the detectives were more credible than Adams. *See* 28 U.S.C. § 2254(d)(2). The state appellate court's findings of fact are presumed correct. That presumption may be rebutted only by clear and convincing evidence. § 2254(e)(1). Adams offers no evidence beyond his own assertions to refute the evidence from the detectives that he did not request counsel. Thus, he fails to offer the clear and convincing evidence necessary to rebut the statutory presumption that the state court's factual findings are correct. Again, the state trial court's factual determinations were based on its view of the credibility of the witnesses. Federal courts generally do not reevaluate the credibility of witnesses when conducting habeas review of state court proceedings, *see Ruvalcaba v. Chandler*, 416 F.3d 555, 560 (7th Cir. 2005), unless, of course, the decision was unreasonable or the factual premise was incorrect by clear and convincing evidence, *Miller-El v. Cockrell*, 537 U.S. 322, 340 (2003). Because Adams failed to rebut the court of appeals' credibility determination by clear and convincing evidence, I must accept the state court's

factual determinations. *See* § 2254(e)(1). For this reason, Adams is not entitled to habeas relief on this ground.

## CERTIFICATE OF APPEALABILITY

According to Rule 11(a) of the Rules Governing § 2254 Cases, the court must issue or deny a certificate of appealability "when it enters a final order adverse to the applicant." A certificate of appealability may issue "only if the applicant has made a substantial showing of the denial of a constitutional right." 28 U.S.C. § 2253(c)(2). To make a substantial showing of the denial of a constitutional right, the petitioner must demonstrate that "reasonable jurists could debate whether (or, for that matter, agree that) the petition should have been resolved in a different manner or that the issues presented were 'adequate to deserve encouragement to proceed further.'" *Slack v. McDaniel*, 529 U.S. 473, 484 (2000) (quoting *Barefoot v. Estelle*, 463 U.S. 880, 893 and n.4).

Reasonable jurists could not debate that Adams fails to raise cognizable ineffective assistance of counsel and *Miranda* claims. Thus, I will deny Adams a certificate of appealability. Of course, Adams retains the right to seek a certificate of appealability from the Court of Appeals pursuant to Rule 22(b) of the Federal Rules of Appellate Procedure.

## ORDER

**NOW, THEREFORE, IT IS ORDERED** that the petitioner's petition for a writ of habeas corpus (Docket # 31) be and hereby is **DENIED**.

**IT IS FURTHER ORDERED** that this action be and hereby is **DISMISSED**.

**IT IS ALSO ORDERED** that a certificate of appealability shall not issue.

**FINALLY, IT IS ORDERED** that the Clerk of Court enter judgment accordingly.

Dated at Milwaukee, Wisconsin this 16th day of November, 2018.

BY THE COURT:

_s/Nancy Joseph_
NANCY JOSEPH
United States Magistrate Judge